STATON v. MOORE.

4-7940                                         196 S. W. 2d 573

Opinion delivered October 7, 1946.

*E. W. Brockman,* for appellant.

*Max M. Smith,* for appellee.

SMITH, J. Appellant brought this suit to quiet her title to lots 2 and 3 of the S. E. quarter, of the S. W. quarter, section 1, township 9 south, range 11 west, Cleveland county, Arkansas. The 40-acre tract of land, of which the described lots are a part, has been divided into 15 lots, the plat of the survey being duly of record. These lots vary in area from one to twelve acres, and are of various shapes. One of these lots, numbered 2, lies directly north of another lot, numbered 3. An answer denied appellant's ownership of these lots, and alleged the acquisition of the title by adverse possession. Upon the submission of the case defendants, appellees, abandoned any claim of title to lot 3. After much conflicting testimony had been introduced, the court found that defendants had acquired title to lot 2 by adverse possession, and dismissed appellant's suit as being without equity as to that lot, but quieted and confirmed appellant's title to lot 3.

Appellant's claim of title to these lots is based upon the following conveyances: A chain of conveyances from the United States to one McMurtrey. By deed from Polly McLendon, dated March 29, 1904, to T. W. Rogers. Under the will of Rogers to his wife Cynthia. By deed from Cynthia to Detie Staton, and by deed from Detie Staton to appellant, Girlie Staton.

Lot number 3 was enclosed by a fence, while lot number 2 was unenclosed, except on the side thereof which joined lot 3. Both lots were described in the deed from Polly McLendon to T. W. Rogers, and possession of lot 3 was taken after the execution of that deed, and lot 3 has been in the possession of Detie or Girlie Staton since their purchase in 1925.

Inasmuch as appellant had actual possession of lot 3, she claims to have had constructive possession of the adjacent lot 2, as both lots were described in the deed

from Polly McLendon, and the deeds under which they claim. Appellant invokes the rule stated in *Thornton* v. *McDonald,* 167 Ark. 114, 266 S. W. 946, that, "Where, under a deed conveying four adjacent lots, the grantee took actual possession of two of the lots and held same adversely for more than seven years, the other two lots being unoccupied, his constructive adverse possession includes the two unoccupied lots."

A complete answer to this contention is that when Detie and Girlie took possession of lot 3, lot 2 was not then unoccupied. On the contrary, lot 2 was in the actual possession of a claimant of the title thereto, which occupancy continued for many years.

Appellant also claims title to lot 2 by virtue of the payment of the taxes thereon for a period of more than seven years. Two answers may be made to this contention: the first being, that lot 2 was not vacant and unoccupied property; the second answer being, that appellant did not pay the taxes on lot 2 for seven consecutive years.

The parties in the payment of the taxes due on these two lots were evidently confused by the descriptions of the lots appearing on the tax books, and Girlie Staton paid taxes for certain years on the south half, lots 2 and 3. Inasmuch as lot 3 is directly south of lot 2, it is apparent that she did not pay taxes on adjoining parcels of land, as the south half of lot 2 is not adjacent to the south half of lot 3. In other years she paid taxes on the east half of lots 2 and 3, and the east half of these lots is adjacent to the other half. The significance of this fact, as will presently appear, is that Girlie never in any one year paid taxes on more than one full lot, and never in any year paid taxes on two lots.

As has been stated, the paper title of Girlie to these lots is derived from the deed of Polly McLendon to T. W. Rogers. Now Polly testified that her first husband, Charles Edward Barnett, owned lot 3 and made his home there for many years, and for more than seven years, but that he never owned or claimed any interest in lot 2. When questioned about her deed describing lots 2 and 3,

she stated that she had no intention of conveying lot 2, as neither she nor her husband ever had any interest in it.

Polly further testified as follows. Her first husband Charles Edward Barnett, was a son of J. M. (Jackie) Barnett, and that she and her husband bought the lot on which Girlie's house now stands, which is lot 3, and that they bought from a Dr. McMurtrey, evidently one of the heirs of the McMurtrey who owned the original record title derived from the United States.

Polly further testified that the other lot, or lot number 2, was owned by Josh Barnett, who was her brother, who died in 1936. She and Edward, her husband, bought their lot, which was lot number 3, and they told Josh about a vacant adjoining lot, which is lot 2, and Josh bought this vacant lot, and built a house thereon, in which he lived until 1924, when Josh left and went to St. Louis. It is not clear when he built his home, but it was more than seven years prior to 1924, and by his occupancy of this lot he acquired title thereto by possession, if he did not have a deed to himself, about which Polly testified. Polly's husband got his deed about 1899, and Josh took possession of lot 3 soon thereafter, but Polly and her husband never lived on lot 2, and never claimed any interest in, or title to lot 2. When Josh moved from lot 2, he left Polly in charge of the house thereon, and she collected the rents for the account of Josh's wife for a number of years, and paid the taxes for the years 1925, 1926, 1927 and 1928, in the name of Emma Barnett, who was Josh's wife. These taxes were paid on the description, north half, lots 2 and 3, and receipts were taken in Emma's name because Emma had directed that this be done. Emma died in 1929. She and Josh were the parents of seven children, and it is not clear how many of these children survived them. Polly rented the property for Emma until Ray, one of Josh's children, took possession of the house.

We think it is very clearly shown that Polly and her husband claim to own and had possession of lot 3, while Josh claimed and had possession of lot 2, and that

Polly and her husband never owned or claimed any interest in lot 2. The fact that never in any one year did appellant Girlie pay taxes on more than one lot strongly corroborates the testimony of Polly that she never owned or intended to sell lot 2, but even if she may not contradict her deed, the deed was not effective to convey the title to lot 2, for the simple reason that Polly had no interest in lot 2 which she could convey.

On February 8, 1930, Pearl Barnett, Ella Roberts, and Nolia Barnett, three of Josh Barnett's children, applied to and obtained from I. E. Moore a loan, and as security therefor executed to Moore a mortgage on the north half of lots 2 and 3. This mortgage granted Moore the right to purchase at the foreclosure sale under the power of sale incorporated in the mortgage, and when the lot was sold under this power, Moore became the purchaser. The holding in the case of *Ellenbogen* v. *Griffey*, 55 Ark. 268, 18 S. W. 126, is to the effect that Moore had the right to purchase at this sale, inasmuch as the mortgage had given him that right.

Moore built a house on lot 2, and his right to do so appears not to have been questioned by Girlie, and upon Moore's death partition of his estate was effected among his heirs and in the partition his son, Victor, acquired in severalty his father's title to lot 2. On March 20, 1941, Victor Moore conveyed the north half, north half of lot 2 to B. W. Thomasson, who for four years was clerk of the circuit court of Cleveland county, and for ten years was postmaster of the town of Rison, the county seat of Cleveland county, of which town the property here in litigation is a part. Thomasson testified that he had known for many years the property which he bought from Victor Moore as the homestead of Josh Barnett.

Thomasson testified that before buying the property he was advised by an abstractor of land title that there was, some complication about the title, and he asked Girlie if she claimed any interest in the lot he contemplated buying, and she told him that she did not and he bought the property, and proceeded to build a house costing about $500 thereon, and he did this without

objection on Girlie's part. He further testified that after he sold this property, which he did on October 14, 1943, to one Clara Mae Scott, Girlie asked him why he did not tell her that he would like to sell, as she would have bought had she known it was for sale.

Girlie denied this testimony and stated that when Thomasson began to build she told him the property belonged to her. We credit the testimony of Thomasson, and not that of Girlie, not only for the reasons already stated, but for the additional reason that on December 18, 1941, Girlie obtained a quit claim deed from J. M. (Jackie) Barnett, the father of Charles Edward Barnett, for lot 3, and for that lot only.

We are led to the conclusion and find the fact to be that Girlie never acquired title to lot 2, and never claimed to have done so until about the time this suit was filed to quiet her title as against Moore and Thomasson, who were named as defendants. This suit was filed April 21, 1942, and by an amendment to the complaint Clara Mae Scott was made a party defendant.

Appellant offered in evidence the deed of the state land commissioner to her, dated November 24, 1941, conveying north half of lots 2 and 3. This deed is based upon a sale for the non-payment of the 1929 taxes. The tax sale on which the deed was based was void for many reasons, but appellant insists upon the authority of the case of *Hopper* v. *Chandler,* 183 Ark. 469, 36 S. W. 2d 398, that appellees may not raise that question, because neither they nor the persons through whom they claim title had any interest in the land at the time of the forfeiture to the state.

Neither of these contentions is sound. It will suffice to say that the Hopper case, *supra,* following the case of *Osceola Land Company* v. *Chicago Mill & Lbr. Co.,* 84 Ark. 1, 103 S. W. 609, construed § 7105, Kirby's Digest, now appearing as § 13874, Pope's Digest, which section provides among other things that " . . . no person shall be permitted to question the title acquired by a deed of the clerk of the county court, without first showing that he, or the person under whom he claims

title to the property, had title thereto at the time of the sale, or that title was obtained from the United States or this State after the sale, and that all taxes due upon the property have been paid by such person, or the person under whom he claims title as aforesaid . . ." with certain named exceptions.

It was held in the case of *St. Louis Refrigerator & Wooden Gutter Co.* v. *Thornton,* 74 Ark. 383, 86 S. W. 852, that this section is limited to deeds made by the county clerk, and does not apply to deeds made by the commissioner of state lands.

The court found that Moore had acquired title by adverse possession to lot 2, but whether this is true or not, the court properly refused to cancel the deeds in the Moore chain of title and to confirm appellant's title to lot 2, for the reason that appellant did not own that lot. The decree is therefore, affirmed.